IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TIMOTHY FUENTES,

                Petitioner,

     vs.

SCOTT R. FRAKES,

                Respondent.

**4:19CV3060**


**MEMORANDUM
AND ORDER**

This matter is before the court on Petitioner Timothy Fuentes' ("Petitioner" or "Fuentes") Petition for Writ of Habeas Corpus. (Filing 1.) For the reasons that follow, Petitioner's habeas petition is denied and dismissed with prejudice.

## I. CLAIMS

Summarized and condensed,[1] and as set forth in the court's prior progression order (filing 5), Petitioner asserted the following claims that were potentially cognizable in this court:

Claim One:      Petitioner was denied the effective assistance of counsel because counsel (1) failed to file pretrial motions; (2) failed to properly conduct jury selection; (3) failed to properly represent Petitioner at trial; (4) failed to properly argue for a new trial; and (5) failed to file a motion for recusal of the trial judge. (Filing 1 at CM/ECF pp. 5-6, 12.)

---

[1] Petitioner did not object to the court's summary and condensation.

Claim Two:            Petitioner was denied the constitutional right to a fair trial because there was insufficient evidence to support his conviction. (*Id.* at CM/ECF pp. 6-7.)

Claim Three:          Petitioner was denied the right to prepare a meaningful defense, due process of law, and the effective assistance of counsel because counsel (1) failed to investigate, depose, and call witnesses who would have provided first-hand knowledge of what happened (*id.* at CM/ECF pp. 7-8); (2) failed to investigate other suspects (*id.* at CM/ECF p. 12); (3) failed to conduct reasonable pretrial discovery and investigation to gather defense evidence to refute the State's theory of sexual assault on a child in the third degree (*id.* at CM/ECF pp. 5-6, 8); and (4) failed to impeach the victim's testimony and offer evidence to refute the photographic lineup in which the victim's mother pressured the victim to identify Petitioner (*id.* at CM/ECF pp. 8, 12).

Claim Four:           Petitioner was denied due process and the effective assistance of counsel because counsel failed to raise several claims on appeal including improper inconsistencies in the victim's statement and lack of evidence when the trial court called a mistrial. (*Id.* at CM/ECF p. 9.)

## II.  BACKGROUND

### A.  Conviction and Sentence

The court states the facts as they were recited by the Nebraska Court of Appeals on direct appeal in *State v. Fuentes*, No. A-13-0340 (Neb. Ct. App. Feb. 26,

2014) ([filing 9-3](#)). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

On the afternoon of August 21, 2012, nine-year-old Analicia B. ran into her parent's basement apartment "scared," "crying," and "upset," and she told her mother, DelMaria B., and her stepfather, Gabriel T., that while she had been sitting on the back bumper of her parents' car in front of the apartment building, a man in a red shirt had touched her private part. DelMaria and Gabriel ran outside and confronted the man in the red shirt, who was identified as Fuentes. Although Fuentes denied touching the victim, several days later Analicia identified his photograph in a photographic lineup. Thereafter, Fuentes was charged with third degree sexual assault of a child, second offense, in violation of Neb. Rev. Stat. § 28-320.01(5) (Reissue 2008). A jury trial was held in January 2013, wherein the jury was charged with determining if Fuentes was guilty of the offense of third degree sexual assault of a child. This trial ended in a deadlocked jury. A mistrial was declared, and a second trial commenced on March 11, 2013.

At the second trial, the evidence established that in August 2012, Analicia was nine years old, having been born in June 2003, and Fuentes was 51 years old, having been born in October 1960. In August 2012, Analicia resided in a house split into two living units: a basement apartment and an upstairs apartment. Analicia resided in the basement apartment with DelMaria, Gabriel, her eight-year-old brother, Gabriel, Jr., and her five-year-old sister, Marissa. The upstairs apartment was occupied by an older couple, Bernice and Willard New, their adult daughter, and their two grandchildren, Jade and Angel.

The first witness to testify at trial was Analicia. According to Analicia, on August 21, 2012, Gabriel was in front of the parties' house supervising Analicia, who was sitting on the back bumper of DelMaria and Gabriel's car watching Marissa, who was riding a bicycle. Analicia testified that she remembered a man, later identified as Fuentes, greeting Gabriel, and then both Gabriel and Fuentes walked into the house, with Gabriel going to the downstairs apartment and Fuentes

going to the upstairs apartment. After Gabriel went inside the apartment, another girl, who worked at Dermer's liquor store located next door to the apartments, was outside watching Analicia and her sister. After about five minutes, the man exited the house, and Analicia testified that he "slid his finger" of his right hand up, then sideways, on her genital area over her clothes. As he was leaving, the man said "bye-bye, mija," which Analicia testified is another word for "little girl." After Fuentes touched her, Analicia told her sister to come with her, and they immediately ran inside to the basement apartment, and Analicia told DelMaria and Gabriel what had happened.

At trial, Analicia testified that the man who touched her had brown and gray hair and was wearing glasses, blue jeans, a red t-shirt, and a baseball cap with cursive letters that she could not read at that time. She identified Fuentes in court as the man who touched her and stated that she was scared when Fuentes touched her. At the time of the trial, Analicia no longer lived with her parents or siblings, having moved to Cheyenne, Wyoming, to live with her grandmother about a month before the trial began.

Gabriel testified that he was outside watching all three of his children when Fuentes came around the corner of Dermer's liquor store, greeted him briefly, then walked into the upstairs apartment. Gabriel then went inside to the downstairs apartment for about five minutes to talk to DelMaria. As Gabriel was about to leave the basement apartment, Analicia came inside crying, she appeared scared and upset, and she said that the man in the red shirt had touched her. Gabriel testified that he went outside to confront Fuentes; however, when he got outside, he saw Fuentes walking away and found him on the east side of Dermer's Liquor Store, along with "quite a few" other people, several of whom were males. According to Gabriel, Fuentes was the only person nearby wearing a red shirt. Gabriel confronted Fuentes and started yelling at him, but Fuentes responded that he "didn't do anything." Fuentes walked away and disappeared from Gabriel's view.

4

Gabriel testified that a month to a month and a half after the incident, the News moved out of the upstairs apartment, and three or four months after they moved out, Gabriel and his family moved out of the basement apartment and into the upstairs apartment. Gabriel further admitted that he had been wanting the upstairs apartment even before the News moved out.

DelMaria's testimony corroborated that when Analicia came to the downstairs apartment she was scared and crying. DelMaria also testified that Analicia's face was red and that she kept saying that "that man outside touched my private." When DelMaria raced outside, she saw Fuentes standing in front of Dermer's Liquor Store talking with the owner of the liquor store. DelMaria testified that she and Gabriel started yelling at Fuentes, accusing him of touching Analicia, but Fuentes repeatedly denied it, stating "I didn't do that, I wouldn't do that." DelMaria stated that it was just she, Gabriel, the owner of the liquor store, and Fuentes present when DelMaria stated that she was going to call the police. DelMaria did call the police, and although police responded within two to three minutes, by the time Scottsbluff Police Officer Matthew Broderick arrived, Fuentes was gone.

Broderick took statements about the incident from both Gabriel and DelMaria, who identified Fuentes as the perpetrator. He did not take a statement from Analicia because he was not trained to interview children regarding claims of sexual assault; rather, the procedure is for the officer to take initial statements from adults, and if a forensic interview of the juvenile is needed, a trained investigator performs that interview. However, several days after the incident, he did show a six-photo lineup to Analicia and she recognized Fuentes in the photographs. Broderick testified that although DelMaria was present when Analicia viewed the photographic lineup, DelMaria did not have any input into the procedure of showing the photographs to Analicia and DelMaria did not say anything during the process.

Fuentes also called witnesses in his defense, including Scottsbluff Police Officers Stephen Wescher and Joe Rohrer, Bernice New, Pauline Poor Bear, Angel Poor Bear, and himself.

5

Wescher testified that on August 24, 2012, Fuentes presented himself at the police station because he had heard that the police were looking for him and he wanted to know why. During the conversation, Wescher told Fuentes that the police were looking for someone who went by the name of "Tiny Tim," and Fuentes stated that he had never gone by that street name. Thereafter, Fuentes left the police station. According to Wescher, Fuentes was calm during the encounter and did not appear evasive. When asked where he had heard the name "Tiny Tim," Wescher responded that he had heard the name when officers were discussing situations and typing reports, but that he was not associating the name "Tiny Tim" to the investigation regarding the alleged sexual assault on Analicia and that the name "Tiny Tim" was not referenced in Broderick's report.

Bernice New testified that Gabriel and DelMaria's family had caused problems since the News moved into the upstairs apartment, including partying every weekend and being loud and keeping her family awake all night. She further testified that as soon as Fuentes left her upstairs apartment on August 21, 2012, she heard Gabriel and DelMaria yelling at Fuentes, and when she looked out her window, she saw them near Gabriel's car, which Fuentes was trying to get past. Both Pauline and Angel testified that only Marissa and Gabriel, Jr. were outside playing on August 21, 2012. Additionally, Angel testified that when Fuentes left the upstairs apartment, she followed him outside, and neither Analicia nor Marissa was outside at that time. When Angel followed Fuentes out of the upstairs apartment, she was one step behind him, there were no girls outside of the house, and she did not see Fuentes go up to any girls. Angel stated that she was getting ready to ride her bicycle when she heard yelling coming from the corner by Dermer's liquor store where Gabriel and DelMaria were yelling at Fuentes, but she could not tell what the yelling was about. However, Angel testified that she did not see either Gabriel or DelMaria come out of their apartment; she just noticed them when she heard them yelling at Fuentes. Angel further testified that Fuentes has called her "mija."

Fuentes testified that he did not see Analicia on August 21, 2012; he did not touch her; and he did not call her "mija." However, on cross-examination, Fuentes admitted that he had only visited the News' residence twice, so Analicia would not have known him to know that he wore glasses or to recognize him to pick him out of a photo lineup. Fuentes further testified that the word "mija" is very common in the Hispanic community and is a term of endearment.

Rohrer testified that he interviewed Fuentes on August 26, 2012. When Rohrer asked Fuentes if he knew about a little girl who was sitting on a car in front of the apartment, Fuentes replied, "I don't know her but I know her family." Rohrer then asked Fuentes why he called her "mija" if he did not know the girl, and Fuentes responded, "I call everyone mija or mijo," but he did not admit calling Analicia "mija."

At the conclusion of the second trial, the jury returned a verdict finding Fuentes guilty of third degree sexual assault of a child. The enhancement and sentencing hearing was held on April 12, 2013. The district court found that Fuentes had one prior conviction and enhanced Fuentes' conviction for third degree sexual assault of a child to a second offense. The district court sentenced Fuentes to 50 to 50 years' imprisonment, which includes a mandatory minimum of five years, with 230 days' credit for time served. Fuentes was also ordered to comply with the Nebraska Sex Offender Registration Act.

**B.  Direct Appeal**

Fuentes appealed his conviction and sentence to the Nebraska Court of Appeals. Fuentes was represented on direct appeal by the same counsel who represented him at trial and sentencing. In his direct appeal, Fuentes assigned as error and argued that (1) the evidence was insufficient to support his conviction; (2) the sentence imposed was excessive; and (3) trial counsel was ineffective for failing to request that the state district court recuse itself from the trial. (Filing 9-5 at CM/ECF pp. 7, 13-39; *see also* Filing 9-3 at CM/ECF p. 9.) In a memorandum opinion entered

February 26, 2014, the Nebraska Court of Appeals affirmed Fuentes' conviction and sentence. ([Filing 9-3.](#)) The court rejected Fuentes' first two assignments of error on the merits[2] and did not address Fuentes' ineffective assistance of trial counsel claim because the record was insufficient to adequately review it. (*[Id.](#)*)

Fuentes filed a petition for further review with the Nebraska Supreme Court. ([Filing 9-8.](#)) Fuentes assigned that the Nebraska Court of Appeals erred in (1) finding the evidence sufficient to support his conviction; (2) affirming the sentence imposed; and (3) affirming the state district court's denial of his motion for new counsel.[3] (*[Id. at CM/ECF p. 1.](#)*) On April 16, 2014, the Nebraska Supreme Court denied Fuentes' petition for further review. ([Filing 9-1 at CM/ECF p. 4.](#)) Fuentes filed a motion for rehearing, which the Nebraska Supreme Court overruled on May 6, 2014. (*[Id. at CM/ECF p. 4.](#)*)

## C. Postconviction Action

On March 27, 2015, Fuentes filed a timely pro se verified motion for postconviction relief. *See State v. Fuentes*, No. CR12-236, District Court of Scotts Bluff County, Nebraska (March 27, 2015 Verified Motion for Postconviction Relief).[4] (*See also* [Filing 9-12 at CM/ECF p. 16.](#)) The state district court appointed new counsel to represent Fuentes in the postconviction matter. (*See [id](#)*.) On October

---

[2] The specific findings and conclusions of the Nebraska Court of Appeals will be discussed as necessary below.

[3] In the argument section of his petition for further review, Fuentes asserted that trial counsel was ineffective for failing to request that the state district court recuse itself from the trial. ([Filing 9-8 at CM/ECF pp. 9-10.](#))

[4] The court takes judicial notice of Fuentes' state court records in *State v. Fuentes*, No. CR12-236, District Court of Scotts Bluff County, Nebraska, which may be accessed online at the Nebraska Judicial Branch's JUSTICE website, [https://www.nebraska.gov/justice/case.cgi](https://www.nebraska.gov/justice/case.cgi). *See* Federal Rule of Evidence 201; *Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (courts "may take judicial notice of judicial opinions and public records").

30, 2017, Fuentes filed an amended verified motion for postconviction relief. (Filing 9-12 at CM/ECF pp. 2-13.)

In the amended postconviction motion, Fuentes alleged that he was denied effective assistance of counsel at trial and on direct appeal because counsel failed to (1) argue ineffective assistance of trial counsel on direct appeal; (2) file a motion to suppress statements during his police station interview; (3) file a motion to recuse the trial judge due to a conflict of interest with prior representation and conviction; (4) file a motion in limine; (5) file a motion to suppress the photo lineup; (6) investigate and depose Analicia Bald Eagle, Unknown Adult, and Gabriel Trejo; (7) object to Jury Instruction No. 1 and No. 5 given at trial; (8) object to Exhibit 5, the certified copy of a prior conviction; (9) object on hearsay grounds to testimony of DelMaria Bald Eagle regarding the identity of Tim Fuentes; and (10) file at the conclusion of the State's evidence a motion for dismissal of charges for failing to prove prima facie case. (Id. at CM/ECF pp. 3-12.)

Because the trial judge had retired, a new district court judge was appointed. Following an evidentiary hearing, the state district court denied Fuentes' amended motion for postconviction relief. (Id. at CM/ECF pp. 16-24.)

Fuentes appealed, and the Nebraska Supreme Court moved the case to its docket. (Filing 9-2 at CM/ECF p. 4.) Fuentes, through counsel, assigned and argued that the state district court erred in denying his amended motion for postconviction relief because counsel was ineffective in failing to (l) file a motion to suppress the photo array and out-of-court identification of Fuentes, (2) investigate and depose a clerk at the liquor store next door to the victim's residence at the time of the alleged sexual assault, (3) investigate and depose an acquaintance of Fuentes who was at the liquor store the day of the incident, (4) investigate and depose a coworker of Fuentes, (5) investigate and depose the unknown male witness at the time of the sexual assault, (6) raise an intoxication defense, (7) seek the recusal of the district court judge, (8) have Fuentes take a polygraph examination, (9) engage in plea negotiations or communicate plea offers from the State to Fuentes, and (10)

adequately explore inaccuracies in the testimony of several witnesses. (Filing 9-9 at CM/ECF pp. 6, 9-21; *see also* Filing 9-4 at CM/ECF p. 5.)

In a published opinion filed April 19, 2019, the Nebraska Supreme Court affirmed the state district court's order dismissing Fuentes' amended motion for postconviction relief. (Filing 9-4.) The court rejected several of Fuentes' claims because they were not raised in the amended postconviction motion. (*Id.* at CM/ECF p. 5.) Specifically, the court determined that the amended postconviction motion did not raise an ineffectiveness claim with respect to the liquor store clerk, Fuentes' acquaintance, or his coworker; nor did it assert ineffectiveness with regard to the failure to raise the intoxication defense, seek a polygraph examination, engage in plea negotiations, or communicate plea deals. (*Id.* at CM/ECF p. 5.) The court rejected on the merits Fuentes' three remaining claims—failure to seek recusal of the district court judge, failure to file a motion to suppress the photo array and out-of-court identification, and failure to adequately explore inconsistencies in witness testimonies.[5] (*Id.* at CM/ECF pp. 5-9.) The mandate was issued by the Nebraska Supreme Court on May 3, 2019. (Filing 9-2 at CM/ECF p. 4.)

## D.  Habeas Petition

Fuentes filed his Petition for Writ of Habeas Corpus in this court on June 20, 2019. (Filing 1.) In response to the Petition, Respondent filed an Answer (filing 12), a Brief (filing 13), and the relevant state court records (filing 9). Fuentes filed a brief (filing 16) in response to Respondent's Answer. Respondent filed a Notice of Submission (filing 17) indicating that he would not be filing a reply brief. This matter is fully submitted for disposition.

---

[5] The specific findings and conclusions of the Nebraska Supreme Court will be discussed as necessary below.

10

## III.  OVERVIEW OF APPLICABLE LAW

Three strands of federal habeas law intertwine in this case. They are (1) exhaustion and procedural default; (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (3) the standard for evaluating a claim of ineffective assistance of counsel. The court elaborates upon those concepts next so that it may apply them later in a summary fashion as it reviews Fuentes' claims.

## A.  Exhaustion and Procedural Default

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

11

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, and then in an appeal to either the Nebraska Supreme Court directly[6] or to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause

---

[6] Where a life sentence has been imposed in a criminal case, the appeal goes directly to the Nebraska Supreme Court. Neb. Rev. Stat. § 24-1106 (West).

and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## B. Nebraska Law Relevant to Procedural Default

Under Nebraska law, you don't get two bites of the postconviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased.").

Moreover, a person seeking postconviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal. *State v. Deckard*, 722 N.W.2d 55, 63 (Neb. 2006) (denying postconviction relief in a murder case and stating: "An appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.")

More specifically, if a person raises an issue in an initial motion for postconviction relief but fails to raise it in an amended motion, the claim is defaulted

under Nebraska law. *State v. Armendariz*, 857 N.W.2d775, 789 (Neb. 2015) (affirming denial of post-conviction relief in a murder case and stating that "[a]n amended pleading supersedes the original pleading, whereupon the original pleading ceases to perform any office as a pleading. It is clear the district court did not err in limiting its analysis to the motion that was before it—the amended motion.").

Similarly, on appeal, the appealing party must both assign the specific error and specifically argue that error in the brief. Otherwise the claim is defaulted under Nebraska law. *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).

Note also that Nebraska has a statute of limitations for bringing postconviction actions that is similar to federal law. It reads:

(4) A one-year period of limitation shall apply to the filing of a verified motion for postconviction relief. The one-year limitation period shall run from the later of:

(a) The date the judgment of conviction became final by the conclusion of a direct appeal or the expiration of the time for filing a direct appeal;

(b) The date on which the factual predicate of the constitutional claim or claims alleged could have been discovered through the exercise of due diligence;

(c) The date on which an impediment created by state action, in violation of the Constitution of the United States or the Constitution of Nebraska or any law of this state, is removed, if the prisoner was prevented from filing a verified motion by such state action;

(d) The date on which a constitutional claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court, if the newly

14

recognized right has been made applicable retroactively to cases on postconviction collateral review; or

(e) August 27, 2011.

Neb. Rev. Stat. § 29-3001(4) (West).

## C.  Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

16

## D.  The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for petitioners to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court

17

has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, ___ U.S. ___, ___, 136 S. Ct. 1149, 1153 (2016) (a "fairminded jurist" could have concluded that repetition of anonymous tip in state-court cocaine-possession trial did not establish that the uncontested facts it conveyed were submitted for their truth, in violation of the Confrontation Clause, or that petitioner was prejudiced by its admission into evidence, precluding federal habeas relief under the AEDPA; petitioner could not establish that petitioner's appellate counsel was ineffective, as appellate counsel was entitled to the "benefit of the doubt"). To demonstrate prejudice on account of appellate counsel's failure to raise a claim on appeal, a petitioner must show a "reasonable probability that an appeal of [the] issue would have been successful and that the result of the appeal would thereby have been different." *Pryor v. Norris*, 103 F.3d 710, 714 (8th Cir. 1997).

## IV.  DISCUSSION

### A.  Claim One

#### 1.  Claim One, Subpart (1)

In Claim One, Subpart (1), Fuentes argues that he was denied the effective assistance of counsel because counsel failed to file pretrial motions. (Filing 1 at CM/ECF pp. 5-6.) Fuentes clarifies in his response brief that he is referring to counsel's failure to file a motion to suppress the photo array. (Filing 16 at CM/ECF p. 14.) Fuentes properly exhausted this claim in the Nebraska state courts. The Nebraska Supreme Court considered and rejected this claim as follows:

Fuentes argues that counsel was ineffective in failing to file a motion to suppress the photo array and in failing to object to all testimony regarding out-of-court identification by Analicia. The basis of his argument appears to be his assertion that Analicia was not given an advisement in advance of identifying him from a photo array and that DelMaria's presence impacted Analicia's identification.

An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law. Whether identification procedures were unduly suggestive and conducive to a substantial likelihood of irreparable mistaken identification is to be determined by a consideration of the totality of the circumstances surrounding the procedures. The factors to be considered are the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness, and the length of time between the crime and the identification. We have noted that "an array of five photographs is sufficient to constitute a fair and adequate array when attempting to identify a single perpetrator."

The record contains very little information about the photo array. The photo array itself is not in the record. There is no dispute that a motion to suppress any identification arising from the photo array was not filed, and counsel did not otherwise object to evidence offered on the photo array and Analicia's identification of Fuentes.

The officer who prepared the photo array and showed it to Analicia testified during trial that he was also the officer who first reported to the scene of the alleged assault. He further testified that at the time he met with Gabriel and DelMaria, he did not interview Analicia, because it was policy for child sexual assault victims to be interviewed by individuals trained in appropriate interview techniques.

The officer further testified that at the time he spoke with Gabriel and DelMaria, the couple identified Fuentes as the individual who had been outside their apartment at the time of the alleged assault, because Gabriel had been outside and had seen Fuentes arrive. The officer also testified that Fuentes was not at the scene when he arrived, but that the

officer effected a traffic stop of Fuentes a few days later, on August 24, 2012.

The officer additionally testified that he prepared a photo array of photographs of six individuals—Fuentes and five others—and showed it to Analicia, in the presence of DelMaria, on August 26, 2012, at the Scottsbluff Police Department. According to this testimony, DelMaria sat next to Analicia but did not say anything during the process.

Analicia testified that the officer showed her the photo array and that she circled the picture of the man who touched her. Analicia also testified at trial that the man who touched her was in the courtroom at the time she was testifying, identifying Fuentes as that person.

Fuentes does not make any particular argument about the makeup of the photo array. Rather, he concentrates his argument on the fact that Analicia did not receive an advisement prior to viewing the photo array and on the fact that DelMaria was present during the showing of the photo array.

There are several problems with Fuentes' contentions on appeal. First, there is no evidence regarding whether Analicia received an advisement prior to looking at the photo array presented to her. Fuentes' trial counsel had passed away prior to the filing of the postconviction motion, but an attorney from the public defender's office testified by deposition about Fuentes' case file. There was no questioning about an advisement during that deposition. The office's file was not offered as an exhibit to the deposition, nor is the police file part of the record before this court. It is not possible to know whether an advisement was actually given, because no one asked that question or offered evidence that might answer that question. Moreover, Fuentes cites to no authority requiring such an advisement; rather, he cites to a memorandum opinion of the Court of Appeals where such an advisement was given.

In addition, a review of the entire record suggests that Fuentes was identified largely because Gabriel was aware that Fuentes had been on the scene at the relevant time and identified Fuentes by name to the investigating officer. The officer had contact with Fuentes for the first time 2 days prior to showing Analicia the photo array. In addition, another officer testified that he had contact with Fuentes at the police

20

department on either August 23 or 24, 2012, because Fuentes had heard officers were looking for him.

Finally, the issue in this case was not who touched Analicia; the issue was whether Analicia was touched. Fuentes does not deny being at the scene at the relevant time. He denied only that he touched Analicia.

Fuentes has not met his burden to show that he was prejudiced by any failure of counsel to suppress the photo array when law enforcement was aware from the time of the alleged incident that it was looking for Fuentes. There is no merit to his argument.

(Filing 9-4 at CM/ECF pp. 7-8 (footnotes omitted).)

A pretrial identification violates due process where an identification procedure is so suggestive as to produce a substantial likelihood of misidentification. *See Manson v. Brathwaite*, 432 U.S. 98, 116 (1977); *Neil v. Biggers*, 409 U.S. 188, 197 (1972). The factors to be considered in determining the reliability of an identification include whether where there are indicia of reliability, such as the witness' opportunity to view the participants in the crime and whether attention was paid; the accuracy of prior descriptions of the accused; the level of certainty that the identifying party demonstrates when confronted with the person who is identified; and the length of time between the crime and the confrontation. *Manson*, 432 U.S. at 114.

Fuentes has not demonstrated that the Nebraska state courts either unreasonably applied *Manson* or unreasonably determined the facts governing the reliability of the victim's out-of-court identification of Fuentes. Specifically, there is no evidence that the photo array was impermissibly suggestive or created a very substantial likelihood of irreparable misidentification. *See id.* at 116. The trial transcripts confirm that the photo array comprised six photographs, including a photo of Fuentes, and was conducted by Officer Broderick several days after the incident; that the victim was brought into the station by her mother to view the photos; and that the victim's mother did not "say anything," "just stood by and

watched," and had no "input into the procedure of showing the pictures to her daughter." ([Filing 9-15 at CM/ECF pp. 101-112](#); *see also* [Filing 9-12 at CM/ECF p. 20](#).) As the state district court found, "there [was] no indication the victim had any hesitation or reservation in the selection of Fuentes in the lineup." ([Filing 9-12 at CM/ECF p. 20](#).)

Moreover, it was not unreasonable for the Nebraska Supreme Court to conclude that Fuentes was not prejudiced by counsel's failure to suppress the photo array and the victim's out-of-court identification of Fuentes. Indeed, the issue in this case was not one of identification but whether the victim was in fact touched. Fuentes did not deny being at the scene of the incident at the relevant time; Gabriel identified Fuentes at trial as the perpetrator; and law enforcement knew from the time of the alleged incident that it was looking for Fuentes. The Nebraska Supreme Court's adjudication of this claim was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings nor was its ruling contrary to, or an unreasonable application of, *Manson*, *Strickland*, or any other federal law.

### (2)  Claim One, Subparts (2), (3), and (4)

In Claim One, Subparts (2), (3), and (4), Fuentes alleges that he was denied the effective assistance of counsel because counsel failed to properly conduct jury selection, represent Fuentes at trial, and argue for a new trial. ([Filing 1 at CM/ECF pp. 5-6](#).) Fuentes did not present these claims in his amended motion for postconviction relief. Thus, Fuentes did not raise these arguments in one complete round in Nebraska's state courts and they are procedurally defaulted. Fuentes cannot raise the issues in a successive postconviction motion. *See Ortiz*, 670 N.W.2d at 792. In addition, any successive postconviction motion filed by Fuentes would also be barred by Nebraska's statute of limitations.

### (3) Claim One, Subpart (5)

In Claim One, Subpart (5), Fuentes contends that he was denied the effective assistance of counsel because counsel failed to file a motion for recusal of the trial judge. (*Id.* at CM/ECF p. 12.) The Nebraska Supreme Court considered and rejected this claim in the context of Fuentes' underlying claim that the trial judge should have recused himself. The court wrote:

> Fuentes contends that the trial judge should have recused himself, because the judge assigned to his case had previously represented him on a criminal matter in 1995. Fuentes further contends that trial counsel was ineffective for not seeking such recusal.
>
> The right to an impartial judge is guaranteed under the Due Process Clauses of the U.S. and Nebraska Constitutions, the parameters of which are coextensive. In order to show a constitutional violation of the right to an impartial judge, a defendant must prove actual bias or structural error. Structural error occurs when the defendant shows that a judge has such a strong personal or financial interest in the outcome of the trial that he or she was unable to hold the proper balance between the State and the accused. Although structural error requires automatic dismissal if brought on direct appeal, not all structural error will result in a presumption of prejudice when raised in a motion for postconviction relief.
>
> In addition to the constitutional right to an impartial judge, the Nebraska Revised Code of Judicial Conduct states that a judge must recuse himself or herself from a case if the judge's impartiality might reasonably be questioned. Under the code, such instances in which the judge's impartiality might reasonably be questioned specifically include where "'"[t]he judge has a personal bias or prejudice concerning a party or a party's lawyer . . . ."'" However, a defendant seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality.
>
> Fuentes essentially acknowledges that this case does not include structural error. Nor does Fuentes argue that his trial judge was aware of confidential information that was harmful to Fuentes' case. Rather,

23

Fuentes now argues that the trial judge should have recused himself due to the appearance of impropriety. But, as we noted in *State v. Buttercase*, a defendant has a heavy burden to overcome the presumption of judicial impartiality and show that the judge has a personal bias or prejudice concerning the defendant.

In *Buttercase*, the defendant sought to force the removal of a judge who had presided over prior criminal charges filed against him. We rejected the claim, noting that "the fact that the court previously presided over other actions involving the parties and made rulings against one or another of the parties" was insufficient to show bias. We observed that the fact that a judge knows most of the attorneys practicing in his or her district is common, and the fact that a judge knows attorneys through professional practices and organizations does not, by itself, create the appearance of impropriety. We further observed that judicial rulings alone almost never constitute a valid basis for a bias or partiality motion directed to a trial judge.

While *Buttercase* dealt with a judge who had previously overseen charges against a defendant, we are presented here with a judge who, 17 years earlier, apparently represented the defendant in a criminal proceeding. The two cases are, of course, factually distinct, but both touch on whether prior knowledge of a defendant creates an appearance of bias.

Fuentes has not offered any evidence whatsoever to show that the trial judge had access to confidential information or even recalled representing Fuentes; that the trial judge used confidential, personal information in presiding over Fuentes' trial or in sentencing him; or, indeed, that the trial judge was biased or prejudiced against Fuentes in any way. We also observe that while Fuentes suggested in his deposition that an oral motion seeking the trial judge's recusal was made, there is no record of such an oral motion, let alone a written motion. Fuentes has failed to meet his burden to show that he was prejudiced by the failure of the trial court judge to recuse himself. There is no merit to this argument on appeal.

(Filing 9-4 at CM/ECF pp. 5-7 (footnotes omitted).)

Due process guarantees "an absence of actual bias" on the part of a judge. *Williams v. Pennsylvania*, ___ U.S. ___, ___, 136 S. Ct. 1899, 1905 (2016) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). The Supreme Court explained:

> Bias is easy to attribute to others and difficult to discern in oneself. To establish an enforceable and workable framework, the Court's precedents apply an objective standard that, in the usual case, avoids having to determine whether actual bias is present. The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, "the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'"

*Williams*, ___ U.S. at ___, 136 S. Ct. at 1905 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009)).

The Nebraska Supreme Court's determination that Fuentes failed to demonstrate that the trial judge was impartial or biased is entitled to deference. The Nebraska Supreme Court's findings, which Fuentes has not rebutted, accurately represent the trial court record. Specifically, the record is devoid of any evidence that the trial judge had access to confidential information or even recalled representing Fuentes; that the trial judge used confidential, personal information in presiding over Fuentes' trial or sentencing; or that the trial judge was biased or prejudiced against Fuentes in any way. Contrary to Fuentes' suggestion, the trial judge's representation of Fuentes 17 years earlier in a different criminal proceeding does not per se establish the trial judge's impartiality or bias.

The Nebraska Supreme Court's ruling regarding the trial judge's impartiality was neither based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, nor was it contrary to, or an unreasonable application of, federal law. Based on the Nebraska Supreme Court's determination that Fuentes failed to demonstrate the trial judge's bias, counsel could not have been ineffective for failing to seek recusal of the trial judge. *See Gray v. Bowersox*, 281 F.3d 749, 756 n.3 (8th Cir. 2002) (when an "underlying objection

would have been without merit, a claim of ineffective assistance is not viable"). Accordingly, Fuentes is not entitled to habeas relief on Claim One, Subpart (5).

## B. Claim Two

Next, Fuentes claims that he was denied the constitutional right to a fair trial because there was insufficient evidence to support his conviction. (Filing 1 at CM/ECF pp. 6-7.) The Nebraska Court of Appeals considered and rejected this claim on direct appeal. The court wrote:

> Fuentes contends that the evidence was insufficient to support his conviction of third degree sexual assault of a child, second offense. He claims that the evidence was so doubtful in character or lacking in probative value that his finding of guilt cannot be sustained. Specifically, he contends that the testimony and evidence showed that the victim's allegations were motivated by improper motives, i.e., to force the News to move from the upstairs apartment so that Analicia's family could move in, and were facilitated by inadequate investigation by law enforcement officers, i.e., that DelMaria manipulated Analicia's identification of Fuentes during the photographic lineup.

> Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009); *State v. Ruegge*, 21 Neb. App. 249, 837 N.W.2d 593 (2013). Only where evidence lacks sufficient probative value as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Howell*, 284 Neb. 559, 571, 822 N.W.2d 391, 401 (2012). Our standard of review for criminal cases requires substantial deference to the factual findings made by the

26

jury. *State v. Davis*, 277 Neb. 161, 762 N.W.2d 287 (2009); *State v. Kelly*, 20 Neb. App. 871, 835 N.W.2d 79 (2013).

A person commits sexual assault of a child in the second or third degree if he or she subjects another person 14 years of age or younger to sexual contact and the actor is at least 19 years of age or older. Neb. Rev. Stat. § 28-320.01(1) (Reissue 2008). Sexual assault of a child is in the third degree if the actor does not cause serious personal injury to the victim. § 28-320.01(3). Sexual contact is defined as "the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts." Neb. Rev. Stat. § 28-318(5) (Cum. Supp. 2012). Sexual contact shall only include such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. *Id.*

The uncontroverted evidence adduced at trial established that Analicia was 9 years old at the time of the assault and Fuentes was 51 years old. Analicia testified that Fuentes approached her and touched the clothing over her vaginal area with his finger. This evidence, when viewed in the light most favorable to the State, clearly establishes the age requirements and intentional touching element of third degree sexual assault of a child and that the touching could reasonably be construed as being for the purpose of Fuentes' sexual arousal or gratification.

Although Fuentes contends that the evidence was so doubtful in character or lacking in probative value that his finding of guilt cannot be sustained, the jury believed the evidence proffered by the State, including Analicia's testimony, and apparently did not believe that the allegations were made to force the News to move from the upstairs apartment, and it is not the role of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. We further note that Broderick's testimony specifically refuted Fuentes' allegation that DelMaria manipulated Analicia's identification of Fuentes during the photographic lineup and the jury apparently believed this testimony. Additionally, the evidence adduced at the enhancement hearing established that Fuentes had previously been convicted of sexual contact with a child in 1996. Thus, the evidence at trial, and the enhancement hearing, was sufficient to

support Fuentes' conviction for third degree sexual assault of a child, second offense, beyond a reasonable doubt.

(Filing 9-3 at CM/ECF pp. 9-12.)

The court's review of a habeas petition that alleges insufficiency of the evidence is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979):

> In *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court articulated a narrow standard of review for questions of sufficiency of the evidence. Under *Jackson*, a habeas petitioner is entitled to relief if [the court] conclude[s] that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt. In applying this standard, [the court] do[es] not re-weigh the evidence, and [the court] must resolve inconsistencies in favor of the prosecution. Under AEDPA, [the court] may grant relief only if [it] find[s] the [Nebraska Court of Appeals'] conclusion that the evidence satisfied the *Jackson* sufficiency of the evidence standard both incorrect and unreasonable.

*Brende v. Young*, 907 F.3d 1080, 1085 (8th Cir. 2018), *cert. denied*, 140 S. Ct. 74 (2019), *reh'g denied*, 140 S. Ct. 634 (2019) (quoting *Nash v. Russell*, 807 F.3d 892, 897 (8th Cir. 2015)).

Having reviewed the trial transcripts and evidence in Fuentes' criminal trial and enhancement hearing, the court finds that the Nebraska Court of Appeals' adjudication of Claim Two did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. The Nebraska Court of Appeals admittedly did not cite *Jackson v. Virginia*, the seminal United States Supreme Court decision on sufficiency of the evidence, but "[a] reasonable application of established federal law 'does not require citation of [United States Supreme Court] cases—indeed, it does not even require *awareness* of [the] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *See Cox v. Burger*, 398 F.3d 1025, 1030 (8th Cir. 2005) (quoting *Early v. Packer*, 537 U.S. 3, 8, (2002)) (emphasis in original). The

28

Nebraska Court of Appeals did, however, correctly apply the essence of *Jackson v. Virginia* to the question of whether the evidence was sufficient to support Fuentes' conviction for third degree sexual assault of a child, second offense, and the Nebraska Court of Appeals did so in an objectively reasonable manner; neither the reasoning nor the result contradicts *Jackson v. Virginia*.

Fuentes has also not shown that the adjudication of the claim by the Nebraska Court of Appeals resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. The Nebraska Court of Appeals found that the State presented evidence from which the jury could have found the age requirements of third degree sexual assault of a child, that the victim identified Fuentes as the individual who intentionally touched the clothing over the victim's vaginal area with his finger, that the touching was for the purpose of Fuentes' sexual arousal or gratification, and that Fuentes had previously been convicted of sexual contact with a child. These facts are confirmed by the trial and enhancement hearing transcripts. Thus, the Nebraska Court of Appeals could, and did, find the evidence sufficient to support Fuentes' conviction for third degree sexual assault of a child, second offense. The court will not reweigh the evidence or assess the credibility of the witnesses in this habeas proceeding. *See Thiel v. Schuetzle*, 200 F.3d 1120, 1122-23 (8th Cir. 1999).

Given the foregoing, the court finds that Fuentes cannot overcome the barrier posed by 28 U.S.C. 2254(d). There is no merit to his claim that the evidence was insufficient to support his conviction for third degree sexual assault of a child, second offense.

## C. Claim Three

### 1. Claim Three, Subpart (1)

Fuentes argues that he was denied the right to prepare a meaningful defense, due process of law, and the effective assistance of counsel because counsel failed to

investigate, depose, and call witnesses who would have provided first-hand knowledge of what happened. (Filing 1 at CM/ECF pp. 7-8.) In his habeas petition, Fuentes does not identify the people he wanted to have testify at his trial, does not provide any affidavits from any of the witnesses regarding their testimony, and does not describe what their testimony would have been. Fuentes' conclusory speculation about the effect of the unidentified favorable witnesses' testimony falls far short of the prima facie showing of prejudice necessary to show ineffective assistance of counsel. Accordingly, his argument regarding counsel's failure to investigate, depose, and call witnesses is without merit.

Alternatively, to the extent Fuentes is basing his ineffective assistance claim on those individuals identified in his amended postconviction motion or brief on postconviction appeal, Fuentes did not raise these arguments in one complete round in Nebraska's state courts and they are procedurally defaulted.

With respect to the individuals identified in the amended postconviction motion—Analicia Bald Eagle, Unknown Adult, and Gabriel Trejo (filing 9-12 at CM/ECF pp. 6-7)—Fuentes did not raise ineffective assistance of counsel claims with respect to these individuals on postconviction appeal. Therefore, these claims are procedurally defaulted. Fuentes cannot raise these claims in a successive postconviction motion. *See Ortiz*, 670 N.W.2d at 792. In addition, any successive postconviction motion filed by Fuentes would also be barred by Nebraska's statute of limitations.

On postconviction appeal, Fuentes assigned and argued that counsel was ineffective in failing to investigate and depose (1) a clerk at the liquor store next door to the victim's residence at the time of the alleged sexual assault, (2) an acquaintance of Fuentes who was at the liquor store the day of the incident, (3) a coworker of Fuentes, and (4) the unknown male witness at the time of the sexual assault. (Filing 9-9 at CM/ECF pp. 6, 12, 14, 16-18; *see also* Filing 9-4 at CM/ECF p. 5.) The Nebraska Supreme Court rejected Fuentes' ineffectiveness claims with respect to three witnesses—the liquor store clerk, Fuentes' acquaintance, and his

coworker—because the claims were not raised in the amended postconviction motion. (Filing 9-4 at CM/ECF p. 5.) *See Deckard*, 722 N.W.2d at 63 (a petitioner seeking postconviction relief must present his or her claim to the state district court or the Nebraska appellate courts will not consider the claim on appeal). Because the Nebraska Supreme Court issued a "plain statement" rejecting on independent and adequate state law grounds Fuentes' ineffective assistance claims related to these three witnesses, the claims are procedurally defaulted.[7] *See Shaddy v. Clarke*, 890

---

[7] The court's review of the amended postconviction motion and brief on postconviction appeal indicate that the Unknown Adult mentioned in the amended postconviction motion and the liquor store clerk mentioned in the brief on postconviction appeal may be the same person. The amended postconviction motion described the Unknown Adult as follows:

> During trial there was testimonial evidence that an unknown employee was standing within visual and hearing ability from where the alleged incident occurred (BOE 22:7-10) Trial counsel should have interviewed and deposed this witness. The testimony of this witness is material and relevant to the issue of defendant['s] guilt or innocen[ce]. This witness would have been able to see and hear whether defendant committed the alleged crime. (BOE 130:14-21).

(Filing 9-12 at CM/ECF pp. 6-7.)

The cited portions of the trial transcript seem to indicate that the Unknown Adult to whom Fuentes was referring was a female clerk at the liquor store next door to the victim's residence around the time of the alleged sexual assault. (*See* Filing 9-13 at CM/ECF pp. 25, 133.) As such, this Unknown Adult identified in the amended postconviction motion appears to be the same individual identified in Fuentes' postconviction appeal brief as the clerk at the liquor store next door to the victim's residence at the time of the alleged sexual assault. Specifically, the postconviction appeal brief states: "The deposition of Dana Salas, which was offered and received (E9, 2:2,2) evidenced the fact that the witness was working on the date of the alleged offense. She was working at Dermer's Liquor store on East Overland, which is near where DelMaria Bald Eagle and her family lived. She was a witness to parts of the aftermath of the alleged incident." (Filing 9-9 at CM/ECF p. 12.)

31

F.2d 1016, 1018 (8th Cir. 1989) (where a Nebraska state court rejects a claim on state procedural grounds, and "issues a plain statement that it is rejecting petitioner's federal claim on state procedural grounds," a federal habeas court is precluded from "reaching the merits of the claim); *see also Greer v. Minn.*, 493 F.3d 952, 957 (8th Cir. 2007) (reiterating that "when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement," federal habeas is barred because "[i]n such instances, the state prisoner forfeits his right to present his federal claim through a federal habeas corpus petition") (quotations omitted). Fuentes cannot raise these issues in a successive postconviction motion. *See Ortiz*, 670 N.W.2d at 792. In addition, any successive postconviction motion filed by Fuentes would also be barred by Nebraska's statute of limitations.

The Nebraska Supreme Court did not address the ineffective assistance claim related to the "unknown male witness," but Fuentes did not identify an "unknown male witness" in his amended postconviction motion. As previously stated, the Nebraska Supreme Court will not consider claims that were not presented to the state district court in the amended postconviction motion. *See Deckard*, 722 N.W.2d at 63. Simply put, Fuentes has not exhausted the ineffective assistance claim related to

---

Assuming the Unknown Adult identified in the amended postconviction motion and the liquor store clerk identified in the postconviction appeal brief are the same person, it is arguable that Fuentes did in fact raise an ineffective assistance claim with regard to this individual in one complete round of review in the Nebraska state courts. Nonetheless, Fuentes does not explain specifically in his habeas petition what testimony this witness would have offered. Fuentes' vague statement that the witnesses would have provided first-hand knowledge of the alleged incident is insufficient to make a substantial case that counsel showed deficient performance by not calling the witnesses. "'Decisions relating to witness selection are normally left to counsel's judgment, and this judgment will not be second-guessed by hindsight.'" *Hanes v. Dormire*, 240 F.3d 694, 698 (8th Cir. 2001) (quoting *Williams v. Armontrout*, 912 F.2d 924, 934 (8th Cir. 1990) (en banc)). Moreover, Fuentes fails to show how the liquor store clerk's testimony would have meaningfully altered the evidentiary picture and changed the outcome of the trial. *See Strickland*, 466 U.S. at 695-96.

the "unknown male witness" in the Nebraska state courts. Fuentes is now barred from doing so because he cannot submit a successive motion for postconviction relief. *See Ortiz*, 670 N.W.2d at 792. In addition, the claim would also be barred by Nebraska's statute of limitations on postconviction motions. Therefore, Claim Three, Subpart (1), with respect to the "unknown male witness," is also procedurally defaulted.

### 2.  Claim Three, Subparts (2), (3), and (4)

Fuentes did not present Claim Three, Subparts (2), (3), and (4) in his amended motion for postconviction relief. Thus, Fuentes did not raise these arguments in one complete round in Nebraska's state courts and they are procedurally defaulted. Fuentes cannot now raise his claims in a successive motion for postconviction relief. *See Ortiz*, 670 N.W.2d at 792. In addition, any successive postconviction motion filed by Fuentes would also be barred by Nebraska's statute of limitations.

### D.  Claim Four

In Claim Four, Fuentes alleges that he was denied due process and the effective assistance of counsel because counsel failed to raise several claims on appeal, including improper inconsistencies in the victim's statement and lack of evidence when the trial court called a mistrial. (Filing 1 at CM/ECF p. 9.) Fuentes did not raise these ineffective assistance of appellate counsel claims in his postconviction appeal, and therefore, Claim Four is procedurally defaulted. Fuentes cannot raise these issues in a successive postconviction motion. *See Ortiz*, 670 N.W.2d at 792. In addition, any successive postconviction motion filed by Fuentes would also be barred by Nebraska's statute of limitations.

To the extent Fuentes is attempting to raise the claim that counsel was ineffective for failing to adequately explore inaccuracies in the victim's testimony *at trial* (*see* filing 16 at CM/ECF p. 23), the Nebraska Supreme Court considered and rejected that claim on the merits. The court wrote:

Somewhat related to Fuentes' allegations regarding the failure to investigate other witnesses is Fuentes' contention that his counsel was ineffective in failing to adequately cross-examine certain witnesses regarding inconsistencies in their statements at trial.

In his motion, Fuentes alleges inconsistencies of several witnesses, but argues on appeal only that Analicia's testimony was inconsistent. Specifically, Fuentes' brief argues that Fuentes testified at his hearing that Analicia's testimony regarding her identification of Fuentes was inconsistent.

Fuentes' argument is without merit. Fuentes does not explain how he believes Analicia's testimony was inconsistent and does not provide any other evidence to suggest actual inconsistencies in her testimony.

Moreover, our review of Analicia's testimony reveals no inconsistencies of note. Analicia testified that Fuentes walked past her into the residence to visit the people who lived on the main floor of the apartment building and that about 5 minutes later, the same man left the building, touching her, as described above, on his way out. There is no real dispute that Fuentes was the man who entered and exited the home; the only dispute is whether he touched Analicia as he left—she testified that he did, while Fuentes testified that he did not.

Fuentes did not meet his burden to show that his counsel was ineffective in failing to point out inconsistencies in Analicia's testimony, because it is not at all clear to what inconsistency Fuentes was referring and, in any case, a review of Analicia's testimony reveals no inconsistency. This assignment of error is without merit.

(Filing 9-4 at CM/ECF p. 9.)

The court finds that the Nebraska Supreme Court reasonably applied *Strickland* in concluding that Fuentes had not demonstrated that trial counsel rendered ineffective assistance by failing to point out inconsistencies in the victim's testimony. The trial transcripts confirm the Nebraska Supreme Court's finding that there were no inconsistencies in the victim's testimony. Thus, applying the

34

deferential standards required by both *Strickland* and by 28 U.S.C. § 2254(d), the court finds nothing to indicate that the Nebraska Supreme Court's ruling was based on an unreasonable determination of the facts in light of the evidence or was contrary to, or involved an unreasonable application of, clearly established federal law.

## E.  No Cause or Prejudice Shown to Excuse Procedural Defaults

The United States Supreme Court's decisions in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), do not save any of Fuentes' procedurally defaulted claims. In *Martinez*, the Supreme Court held that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17. The Supreme Court elaborated on and expanded this cause exception in *Trevino*. There, the Supreme Court held that *Martinez* is applicable not only in circumstances where a state requires a defendant to raise a claim of ineffective assistance of trial counsel in a state collateral proceeding, but also when a state maintains a procedural regime that amounts to such a requirement (i.e., when it is "virtually impossible" for an ineffective assistance claim to be raised on direct review). *Trevino*, 569 U.S. at 417.

Assuming, without deciding, that *Martinez* applies to federal habeas corpus cases arising from Nebraska convictions, the holding in *Martinez* does nothing to excuse the procedural default of Fuentes' claims. In *Martinez*, the Court reasoned that a federal habeas court should "hear a claim of ineffective assistance of *trial counsel* when an attorney's errors (or the absence of an attorney) caused a procedural default *in an initial-review collateral proceeding*." 566 U.S. at 14 (emphasis added). Here, the default of Fuentes' ineffective assistance of trial counsel claims at Claim Three, Subpart (1), regarding Analicia Bald Eagle, Unknown Adult, and Gabriel

Trejo, occurred, not on initial review (i.e. in his amended postconviction motion), but when he failed to properly raise them in his postconviction appeal to the state appellate courts. *See Mumin v. Frakes*, No. 4:16CV3033, 2017 WL 1131888, at \*10 (D. Neb. Mar. 24, 2017); *Williams v. Kenney*, No. 4:13CV3170, 2014 WL 5107145, at \*6 (D. Neb. Oct. 10, 2014). Further, *Martinez* does not apply to Fuentes' ineffective assistance of appellate counsel claim (Claim Four). *See Davila v. Davis*, ___ U.S. ___, 137 S. Ct. 2058 (2017); *Dansby v. Hobbs*, 766 F.3d 809 (8th Cir. 2014).

Moreover, with respect to those ineffective assistance of trial counsel claims that are procedurally defaulted because they were not raised in the amended postconviction motion, "[t]o overcome the default, [Fuentes] must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that [Fuentes] must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. No such demonstration has been made with respect to any of these claims. Rather, Fuentes' allegations of deficient performance are conclusory and speculative with no support in the record. Such bare and conclusory allegations of ineffective assistance of counsel are insufficient to warrant habeas corpus relief. *See Bryson v. United States*, 268 F.3d 560, 562 (8th Cir. 2001) (vague and conclusory habeas claims do not entitle a petitioner to relief); *Spillers v. Lockhart*, 802 F.2d 1007, 1009-10 (8th Cir. 1986) (same).

## V.  CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Fuentes is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that the Petition for Writ of Habeas Corpus (filing 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

Dated this 24th day of November, 2020.

BY THE COURT:

Richard G. Kopf

Richard G. Kopf
Senior United States District Judge